J. Walter Sinclair, ISB #2243
Email: *jwsinclair@stoel.com*
Sara M. Berry, ISB #7723
*Email: smberry@stoel.com*
STOEL RIVES, LLP
101 S. Capitol Blvd., Ste 1900
Boise, ID 83702
Telephone: (208) 389-9000
Facsimile: (208) 389-9040

Attorneys for Defendants St.
Luke's Health System, Ltd. and
St. Luke's Regional Medical
Center, Ltd.

Jack R. Bierig *(pro hac vice)*
Email: *jbierig@sidley.com*
Scott D. Stein *(pro hac vice)*
*Email: sstein@sidley.com*
Tacy F. Flint *(pro hac vice)*
*Email: tflint@sidley.com*
Ben Keith *(pro hac vice)*
*Email: bkeith@sidley.com*
SIDLEY AUSTIN LLP
One South Dearborn
Chicago, IL 60603
Telephone: (312) 853-7000
Facsimile: (312) 853-7036

Brian K. Julian, ISB #2360
*Email: bjulian@ajhlaw.com*
ANDERSON, JULIAN
& HULL, LLP
C.W. Moore Plaza
250 South Fifth Street, Ste. 700
Post Office Box 7426
Boise, ID 83707-7426
Telephone: (208) 344-5800
Facsimile: (208) 344-5510

Attorney for Saltzer Medical
Group, P.A.

## UNITED STATES DISTRICT COURT

### FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| SAINT ALPHONSUS MEDICAL CENTER, NAMPA, INC., TREASURE VALLEY HOSPITAL LIMITED PARTNERSHIP, SAINT ALPHONSUS HEALTH SYSTEM, INC., AND SAINT ALPHONSUS REGIONAL MEDICAL CENTER, INC., <br><br> Plaintiffs, <br><br> v. <br><br> ST. LUKE'S HEALTH SYSTEM, LTD, and ST. LUKE'S REGIONAL MEDICAL CENTER, LTD., <br><br> Defendants. | Case No. 1:12-cv-00560-BLW (Lead Case) <br><br><br><br> **DEFENDANTS' PRETRIAL MEMORANDUM** |
| FEDERAL TRADE COMMISSION; STATE OF IDAHO <br><br> Plaintiffs, <br><br> v. <br><br> ST. LUKE'S HEALTH SYSTEM, LTD.; SALTZER MEDICAL GROUP, P.A. <br><br> Defendants. | Case No. 1:13-cv-00116-BLW |

# TABLE OF CONTENTS

INTRODUCTION ............................................................................................................1

ARGUMENT ..................................................................................................................4

I.     Legal Standards................................................................................................4

     A.    The Parties' Burdens ................................................................................4

     B.    Evaluating Competitive Effects ...............................................................6

         1.    The significance of procompetitive effects...................................6

         2.    The requirements for establishing anticompetitive effects .........8

             a.    Government plaintiffs' claims ....................................8

             b.    Hospital plaintiffs' claims .........................................9

         3.    Determining the overall effects on consumer welfare ................9

II.    The Saltzer Transaction Will Promote Competition.........................................10

     A.    St. Luke's Will Bring Integrated Care to the Population of Southern Idaho. ........12

         1.    Steps That St. Luke's Has Already Taken .................................13

             a.    Investment in information health technology ...............13

             b.    Risk-based contracting................................................15

             c.    Moving physicians to value-based compensation.........16

          2.    St. Luke's programs exemplifying the benefits of integrated care ............16

     B.    The PSA with Saltzer—as Contrasted with a Looser Affiliation—Will Further Promote Integrated Care. .......................................................17

         1.    Affiliating with Saltzer will promote St. Luke's efforts to bring integrated care to Canyon County.............................................18

         2.    Saltzer patients will benefit from the transaction. .....................19

III.   Plaintiffs' Evidence of Purported Anticompetitive Effects Is Unpersuasive....................21

     A.    Plaintiffs' Claims of Supposed Harms from Concentration Are Overblown. ........21

         1.    Plaintiffs Have Failed to Define a Proper Geographic Market.................22

2. Notwithstanding the Saltzer Transaction, There Is Vigorous Competition in Any Properly Defined Relevant Market. .................................................24

B. Plaintiffs' Evidence of Supposed Price Increases Is Unconvincing. .....................25

1. St. Luke's Past Transactions, in Other Markets, Do Not Support Plaintiffs' Claims That the Saltzer Transaction Will Result in Anticompetitive Effects in Nampa.........................................................................................26

2. Plaintiffs' Evidence of Price Negotiations with Commercial Insurers Does Not Support Any Claim of Anticompetitive Pricing .................................27

C. The Hospital Plaintiffs' Claims of Unlawful Exclusionary Conduct Are Factually and Analytically Unsupported. .............................................................................29

IV. Divestiture Is Not an Appropriate Remedy ......................................................................31

A. Divestiture Would Not Inject Competition into the Market ..................................31

B. Divestiture Would Cause Substantial Harm To Consumers..................................32

C. Given the Unique Structure of The Transaction, Divestiture Would Be Particularly Inappropriate at This Time................................................................34

# TABLE OF AUTHORITIES

**Page(s)**

CASES

Abadir & Co. v. First Miss. Corp.,
651 F.2d 422 (5th Cir. 1981) ............................................................6

Blue Cross v. Marshfield Clinic,
65 F.3d 1406 (7th Cir. 1995) ......................................................5, 35

Broad. Music, Inc. v. Columbia Broad. Sys., Inc.,
441 U.S. 1 (1979) ("BMI") ............................................................7

Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.,
509 U.S. 209 (1993).........................................................................8

Brown Shoe Co. v. United States,
370 U.S. 294 (1962)........................................................................4

Brunswick v. Pueblo Bowl-O-Mat,
429 U.S. at 477, 487 (1977)............................................................9

FTC v. Butterworth Health Corp.,
946 F. Supp. 1285 (W.D. Mich. 1996) .........................................25

FTC v. PepsiCo, Inc.,
477 F.2d 24 (2d Cir. 1973)............................................................31

FTC v. Phoebe Putney Health Sys., Inc.,
No. 1-11-CV-00058 (M.D. Ga.) (Dkt. 129, June 15, 2013) .........34

FTC v. Staples,
970 F. Supp. 1066 (D.D.C. 1997)...................................................5

FTC v. Tenet Health Care Corp.,
186 F.3d 1045 (8th Cir. 1999) .....................................................5, 7

Garabet v. Autonomous Techs. Corp.,
116 F. Supp. 2d 1159 (C.D. Cal. 2000) ........................................31

In re Evanston Northwestern Healthcare Corp.,
2008 WL 1991995 (FTC Apr. 28 2008) .......................................34

McGlinchy v. Shell Chem.,
845 F.2d 802 (9th Cir. 1988) ..........................................................9

*Miller v. Cal. Pac. Med. Ctr.*,
    991 F.2d 536 (9th Cir. 1993) ...................................................................7

*Morgan, Strand v. Radiology Ltd.*
    924 F.2d 1484 (9th Cir. 1991) .................................................................21

*Olin Corp. v. FTC*,
    986 F.2d 1295 (9th Cir. 1993) ..............................................................5, 6

*Pool Water Prods. v. Olin*,
    258 F.3d 1024 (9th Cir. 2001) .................................................................9

*R.C. Dick Geothermal Corp. v. Thermogenics, Inc.*,
    890 F.2d 139 (9th Cir. 1989) .................................................................21

*Rebel Oil Co. v. Atl. Richfield Co.*,
    51 F.3d 1421 (9th Cir. 1995) ...................................................................8

*Reiter v. Sonotone Corp.*,
    442 U.S. 330 (1979) ..............................................................................2, 9

*Rick-Mik Enterprises, Inc. v. Equilon Enterprises LLC*,
    532 F.3d 963 (9th Cir. 2008) ...................................................................8

*SCFC ILC, Inc. v. Visa USA, Inc.*,
    36 F.3d 958 (10th Cir. 1994) .................................................................10

*United States v. Baker Hughes, Inc.*,
    908 F.2d 981 (D.C. Cir. 1990) ........................................................ passim

*United States v. Citizens & S. Nat'l Bank*,
    422 U.S. 86 (1975) .................................................................................4, 5

*United States v. E.I. du Pont de Nemours & Co.*,
    366 U.S. 316 (1961) ............................................................................31, 33

*United States v. Gen. Dynamics*,
    415 U.S. 486 (1974) ................................................................................6

*United States v. H&R Block, Inc.*,
    833 F. Supp. 2d 36 (D.D.C. 2011) ..........................................................5

*United States v. Marine Bancorporation, Inc.*,
    418 U.S. 602 (1974) .............................................................................4, 8

*United States v. Penn-Olin Chem. Co.*,
    378 U.S. 158 (1964) ................................................................................4

*United States v. Reed Roller Bit Co.*,
  274 F. Supp. 573 (W.D. Okla. 1967) ..................................................................31

*United States v. Rockford Mem'l Corp.*,
  898 F.2d 1278 (7th Cir. 1990) ...........................................................................4

*United States v. Syufy Enterprises*,
  903 F.2d 659 (9th Cir. 1990) ......................................................................10, 24

## STATUTES

15 U.S.C. § 1 .............................................................................................................4

15 U.S.C. § 18 ........................................................................................................4, 5

42 U.S.C. § 1395jjj ..................................................................................................11

Idaho Code Ann. § 48-104 .......................................................................................4

Idaho Code Ann. § 48-106 .......................................................................................4

## OTHER AUTHORITIES

Frank H. Easterbrook, *The Limits of Antitrust*, 63 Tex. L. Rev. 1, 2-7 (1984) ............................10

Regina E. Herzlinger, *Why Innovation in Health Care Is So Hard*, Harv. Bus. Rev. 2006,
  May 84(5); 58-66 .............................................................................................1, 35

Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust
  Principles and Their Application* (3d ed. 2010) ...........................................6, 9, 29

## INTRODUCTION

In *Why Innovation in Health Care Is So Hard*,[1] Professor Regina E. Herzlinger of the

Harvard Business School writes:

> The integration of health care activities—consolidating the
> practices of independent physicians, say, or integrating the
> disparate treatments of a particular disease—can lower costs and
> improve care.  But doing this isn't easy ….
>
> As with consumer-focused innovations, ventures that experiment
> with new business models often face opposition from local
> hospitals, physicians, and other industry players for whom such
> innovation poses a competitive threat.  Powerful community-based
> providers that might be harmed by a larger or more efficient rival
> work to undermine the venture, often playing the public policy
> card by raising antitrust concerns ….

Elsewhere in the article, Professor Herzlinger notes that a "company with a new health care idea

should also be aware that regulators, to demonstrate their value to the public, may ripple their

muscles occasionally by tightly interpreting ambiguous rules or punishing a hapless innovator."

Professor Herzlinger's cogent article anticipates and summarizes this case.  St. Luke's

Health System has sought to integrate the delivery of health care—in part by affiliating with the

Saltzer Medical Group in Canyon County, whose physicians share its vision of providing

coordinated care for patients utilizing a unified electronic health record ("EHR"), best medical

practices, and rigorous quality control and utilization review metrics.  St. Luke's will

demonstrate through the testimony of its CEO, David Pate, M.D., and others, that this affiliation

is part of a larger plan to improve the quality and lower the costs of health care for patients in

Ada and Canyon Counties.  We will likewise show that another part of this plan is a strategic

alliance with Utah-based insurer, SelectHealth, to offer a risk-based insurance product in

southern Idaho—and that the affiliation with Saltzer is critical to the success of that venture.

---

[1] Harv. Bus. Rev. 2006, May 84(5); 58-66 (attached hereto as Ex. A).

**DEFENDANTS' PRETRIAL MEMORANDUM - 1**

Just as Professor Herzlinger predicted, St. Luke's effort to innovate and promote competition has provoked opposition from local hospitals—*i.e*. Saint Alphonsus and Treasure Valley Hospital—which are threatened by a more efficient rival and which, as Professor Herzlinger foretold, have played the antitrust card.  St. Luke's effort has also engendered resistance from "other industry players"—most notably Blue Cross of Idaho, which, fearing the competition that SelectHealth will provide through its alliance with St. Luke's, has done everything it can to support the plaintiffs.  In addition, apparently undervaluing both the consumer benefits that will result from the Saltzer transaction and the significant time that it takes for those benefits to be realized, the FTC and the Attorney General of Idaho have sought to demonstrate their value by advocating a formalistic interpretation of the antitrust laws that would ironically transform those laws from a "consumer welfare prescription," *see Reiter v. Sonotone Corp*., 442 U.S. 330, 343 (1979), into a competitor protection scheme.

As we discuss in Part I, however, the antitrust laws are not nearly as rigid as plaintiffs portray them.  They direct this Court to balance the likely procompetitive effects of the Saltzer transaction against its purported anticompetitive effects. They do not authorize a conclusion that the transaction is unlawful unless the Court finds that, on balance, the overall consequences of the transaction may be to substantially lessen competition in a properly defined market.

In Part II, we explain how the evidence will show that the Saltzer transaction will have substantial procompetitive benefits in two different markets—the market for delivery of medical care in the two-county area and the market for health insurance in this State.  We note how the transaction accords with the best thinking in health policy, is designed to create a system similar to institutions such as the Mayo Clinic which have become role models for providing quality

care at lower cost, and furthers Congressional policy expressed in the Affordable Care Act.  We also discuss how the transaction's tight integration of physicians is critical to its success.

In Part III, we address plaintiffs' claims that the transaction will be anticompetitive.  We examine how the evidence will show that plaintiffs' arguments that the town of Nampa is the relevant market is refuted both by economic analysis and by a natural experiment conducted by Micron Technology when it excluded both St. Luke's and Saltzer from its network.  We explain why evidence from other markets such as the Magic Valley is not predictive of any price increase resulting from enhanced market power resulting from the Saltzer transaction.  Further, we describe why the hospital plaintiffs' concerns about loss of referrals and exclusion from networks are both unsupported by the facts and predicated on an erroneous view of the law.

Finally, in Part IV, we point out why, on the facts of this case, the divestiture of Saltzer would be a highly inappropriate remedy.  It would not make the market more competitive.  Rather, it would deprive consumers of the benefits that the transaction will bring if allowed to go forward, and it will undermine important policies of both the Idaho Department of Health and Welfare and the Idaho Department of Insurance.  Moreover, it is not required at this time because the transaction can readily be unwound if it turns out to result in the monopolistic practices about which plaintiffs have speculated.

The title of Professor Herzlinger's article is most telling:  Innovation in health care is hard indeed.  But innovation is crucial if we are to have a system that lowers costs, promotes quality, and provides access for all Idahoans.  For the reasons that will be brought out at trial, this court should not let the self-interested hospital plaintiffs and the misguided government plaintiffs succeed in stifling St. Luke's innovation through this lawsuit.

## ARGUMENT

**I.    Legal Standards**

All the plaintiffs challenge the Saltzer transaction under § 7 of the Clayton Act, 15 U.S.C. § 18, and the analogous Idaho state law, Idaho Code Ann. § 48-106.  SaintAl's/TVH Am. Compl., Dkt. 63, ¶¶ 131-52; Gov't Compl., Dkt. 98, ¶ 66.  The hospital plaintiffs also challenge the transaction under § 1 of the Sherman Act, 15 U.S.C. § 1, and the corresponding Idaho state law, Idaho Code Ann. § 48-104.  Saint Al's/TVH Am. Compl., Dkt. 63, ¶¶ 131-52.  As the hospital plaintiffs have agreed, Dkt. 22-27 at 5 n.2., claims under both Clayton Act § 7 and Sherman Act § 1 are generally adjudicated according to the same standards.  *See*, *e.g.*, *United States v. Rockford Mem'l Corp.*, 898 F.2d 1278, 1283 (7th Cir. 1990).

**A.    The Parties' Burdens**

To prevail, the plaintiffs must establish that the Saltzer transaction is likely, on balance, to cause substantial anticompetitive effects in a properly defined market.  *United States v. Penn-Olin Chem. Co.*, 378 U.S. 158, 171 (1964).  Although § 7 is designed to "curb[] in their incipiency" anticompetitive trends, *Brown Shoe Co. v. United States*, 370 U.S. 294, 346 (1962), the statute deals with "probabilities" and not "ephemeral possibilities" of anticompetitive effects. *Id.* at 323; *United States v. Marine Bancorporation, Inc.*, 418 U.S. 602, 622–23 (1974) (rejecting claim that was "considerably closer to 'ephemeral possibilities' than to 'probabilities'").

The burden of persuasion always remains on the plaintiffs.  *See*, *e.g.*, *United States v. Citizens & S. Nat'l Bank*, 422 U.S. 86, 120 (1975); *United States v. Baker Hughes, Inc.*, 908 F.2d 981, 982-83 (D.C. Cir. 1990).  Thus, the plaintiffs must make a *prima facie* showing that the transaction will lead to undue concentration in a properly defined market, establishing a presumption that the transaction will substantially lessen competition.  *Baker Hughes*, 908 F.2d at 982.  St. Luke's may then rebut this presumption by showing that the plaintiffs' market-share

statistics inaccurately depict the likely competitive effects. *Citizens & S. Nat'l Bank*, 422 U.S. at 120; *Baker Hughes*, 908 F.2d at 991.

The government plaintiffs have argued that, in offering evidence to rebut any prima facie showing of anticompetitive effects, a defendant bears a "heavy burden" to "'verify by reasonable means the likelihood and magnitude of each asserted efficiency, how and when each would be achieved (and any costs of doing so), how each would enhance the merged firm's ability and incentive to compete, and why each would be merger-specific.'" Dkt. 160 at 3.[2]   In fact, however, a defendant may rebut a prima facie showing with credible evidence that the plaintiff's evidence gives an inaccurate prediction of the transaction's probable effect. *FTC v. Staples*, 970 F. Supp. 1066, 1089 (D.D.C. 1997) (rejecting the FTC's position that the defendant's evidence must be "clear and convincing"); *Baker Hughes*, 908 F.2d at 991-92 (refusing to require that the defendant "'clearly' disprov[e] future anticompetitive effects").

"[E]vidence on a variety of factors can rebut a prima facie case," *id.* at 984, including as relevant here, evidence that the transaction will lead to "integrated delivery" of care and, ultimately, "better medical care." *FTC v. Tenet Health Care Corp.*, 186 F.3d 1045, 1054 (8th Cir. 1999); *see also Blue Cross v. Marshfield Clinic*, 65 F.3d 1406, 1412 (7th Cir. 1995).  In rebutting a plaintiff's *prima facie* case, the defendant cannot be required to produce evidence with "a degree of clairvoyance alien to section 7, which … deals with probabilities, not certainties." *Baker Hughes*, 908 F.2d at 987.  If the defendant rebuts the presumption, the plaintiff has the burden of proving additional anticompetitive effects. *Id.* at 983.

---

[2] Notably, although the government plaintiffs purport to quote the district court in *United States v. H&R Block, Inc.*, 833 F. Supp. 2d 36, 89 (D.D.C. 2011), for this proposition, the quote actually comes from the FTC and Department of Justice's *Horizontal Merger Guidelines* (2010) (hereinafter "Guidelines"), which were in turn quoted by the district court in *H&R Block*.  As the Ninth Circuit has made clear, this Court is not bound by the Guidelines. *Olin Corp. v. FTC*, 986 F.2d 1295, 1300 (9th Cir. 1993) ("Certainly the Guidelines are not binding on the courts….").

**DEFENDANTS' PRETRIAL MEMORANDUM - 5**

This Court ultimately applies a "totality-of-the-circumstances" test and weighs all relevant factors to determine the transaction's overall effect on competition. *Id.* at 984 ("Evidence of market concentration simply provides a convenient starting point for a broader inquiry into future competitiveness."); *see also United States v. Gen. Dynamics*, 415 U.S. 486, 498 (1974) (market share and concentration statistics, while significant, are not conclusive indicators of anticompetitive effects). Significantly, market concentration statistics alone are insufficient to win a case. *Baker Hughes*, 908 F.2d at 991-92 ("The Herfindahl-Hirschman Index cannot guarantee litigation victories."). The primary relevance of the HHI analysis is for federal agencies in considering whether a transaction warrants further action on their parts—not to determine the outcome of litigation. *See Olin*, 986 F.2d at 1300 (federal agencies' Guidelines, which use HHI in assessing transactions, "[c]ertainly … are not binding on the courts").

## B.      Evaluating Competitive Effects

### 1.      The significance of procompetitive effects

At trial, St. Luke's will present substantial evidence of the extensive procompetitive effects of the Saltzer transaction. *See* Part II, *infra*. In this connection, it is noteworthy that, unlike most of the cases relied upon by plaintiffs, the Saltzer transaction is principally a vertical one, *i.e.*, between firms that occupy "vertically related market positions." Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application* ¶ 900 (3d ed. 2010) (hereinafter "Areeda"). Specifically, St. Luke's is a health system while Saltzer is a previously independent group of 41 physicians, 34 of whom practice in Nampa, offering predominantly primary care.

As shown in Part II, bringing Saltzer into the larger St. Luke's system will allow the affiliated entities to offer the benefits of integrated care. These vertical effects are highly significant. *See, e.g.*, *Abadir & Co. v. First Miss. Corp.*, 651 F.2d 422, 423-24 (5th Cir. 1981).

**DEFENDANTS' PRETRIAL MEMORANDUM - 6**

In particular, the procompetitive effects of the transaction will establish that, in the specific economic circumstances of this case, the plaintiffs' focus on market concentration inaccurately depicts the post-merger competitive state of the market.  *See, e.g.*, *Tenet Health Care Corp.*, 186 F.3d at 1054 (reversing preliminary injunction where district court had failed to consider, in evaluating overall competitive effect of merger of two hospitals, evidence that the merger would produce "better medical care than either of those hospitals could separately" because the merged entities could "offer integrated delivery").

By affiliating with Saltzer, St. Luke's seeks to offer patients a product—integrated, risk-based health care—that is fundamentally different from the fee-for-service ("FFS") medicine that Saltzer could offer as an independent group of physicians.  In such circumstances, the Supreme Court has made clear that a flexible analysis is required.  *See, e.g.*, *Broad. Music, Inc. v. Columbia Broad. Sys., Inc.*, 441 U.S. 1, 9, 21-22 (1979) ("*BMI*") (declining to apply per se analysis to horizontal agreement among competitors to offer blanket licenses to copyrighted music, even where the competitors "literally 'fixed' a 'price,'" because "the whole [blanket license] is truly greater than the sum of its parts; it is, to some extent, a different product").  Just as the *BMI* Court did not apply a strict per se rule to invalidate an efficient blanket license that was viewed as a new product, this Court should recognize the new product that the Saltzer transaction is part of creating.  Simply put, antitrust law does not support the preclusion of health care transactions that will lead to procompetitive innovation.  *Cf. Miller v. Cal. Pac. Med. Ctr.*, 991 F.2d 536, 545 (9th Cir. 1993) (vacating preliminary injunction requiring dissolution of merger under federal labor laws where "[u]npacking the merger might … detract from the quality of medical care CPMC provides its patients" and mean that "innovative procedures" made possible by the merger "would have to be abandoned").

**DEFENDANTS' PRETRIAL MEMORANDUM - 7**

### 2. The requirements for establishing anticompetitive effects

Both the government and hospital plaintiffs assert that the Saltzer transaction creates too much concentration in the market for primary care physician ("PCP") services in Nampa, and gives St. Luke's market power.  However, the government and hospital plaintiffs advance significantly different theories as to how the alleged increase in market concentration is supposed to lead to harm to competition.  Their differing theories require different showings.

### a. Government plaintiffs' claims

The basic theory of the government plaintiffs is that the Saltzer transaction will enable St. Luke's to exercise market power by raising prices above competitive levels—to the detriment of commercial payers.  *E.g.*, Gov't Compl. ¶ 1.  To maintain this claim, the government plaintiffs must prove that the transaction is likely to lead to a significant and non-transitory increase in prices, above competitive levels, *in a properly defined market* for a particular product in a particular geographic area.  *E.g.*, *Marine Bancorporation*, 418 U.S. at 618; *Baker Hughes*, 908 F.2d at 982.  Thus, as the Court has already recognized, the plaintiffs cannot rely on purported effects in *different* product or geographic markets to establish that the Saltzer transaction will purportedly cause anticompetitive effects in any relevant market.  *See* Ex. B, Aug. 26, 2013 Hearing Tr. at 37:25-38:9; *Rick-Mik Enterprises, Inc. v. Equilon Enterprises LLC*, 532 F.3d 963, 972 (9th Cir. 2008) ("failure to allege power *in the relevant market* is a sufficient ground to dismiss an antitrust complaint") (emphasis added).  Nor may plaintiffs rely solely on evidence that prices are likely to increase if the increased price is not above competitive levels.  Price increases, standing alone, do not create any concern under the antitrust laws.  *See, e.g.*, *Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 232 (1993); *Rebel Oil Co. v. Atl. Richfield Co.*, 51 F.3d 1421, 1434 (9th Cir. 1995).

### b.     Hospital plaintiffs' claims

As the hospital plaintiffs have conceded, they have no standing to challenge the Saltzer transaction on the ground that that transaction will raise prices.  *See* Dkt. 151 at 4.  Instead, they advance a theory that the transaction between St. Luke's and Saltzer will harm *them* so severely that it will ultimately harm *competition*.  *See, e.g.*, Saint Al's/TVH Am. Compl. ¶ 2(c).  Such a claim is impossible to prove on the facts of this case.

Initially, it is a fundamental tenet of antitrust law that a transaction is unlawful only if it harms *competition*—not if it harms competitors.  *E.g.*, *Pool Water Prods. v. Olin,* 258 F.3d 1024, 1034 (9th Cir. 2001); *see also Brunswick v. Pueblo Bowl-O-Mat*, 429 U.S. at 477, 487 (1977).  Indeed, even elimination of a competitor from the market is insufficient, without more, to constitute harm to competition.  *McGlinchy v. Shell Chem.*, 845 F.2d 802, 812 (9th Cir. 1988).  Moreover, "courts are properly skeptical of many rivals' [antitrust] suits," because "a competitor opposes efficient, aggressive, and legitimate competition by its rivals."  Areeda ¶ 348a.

The hospital plaintiffs' "vertical foreclosure" theory can be maintained only in the very rare case where harm to the plaintiffs effects significant foreclosure in the overall market.  *See* Areeda ¶¶ 1004a, 1004f ("the foreclosure theory has serious weaknesses"; the conditions necessary for harm to competition to result from a supposed foreclosure are "stringent"); *see also id.* ¶ 1004c ("Even complete self-dealing, with an absolute refusal to sell or purchase from any outsider, results in no foreclosure in a competitive market.").  Any time that "the number of firms, though reduced, remains sufficient for effective price competition," there has been no competitive harm actionable under the antitrust laws.  *Id.* ¶ 1010.

### 3.     Determining the overall effects on consumer welfare

At bottom, the goal of the antitrust laws is to enhance consumer welfare—not to maintain a particular HHI.  *See Reiter*, 442 U.S. at 343 (antitrust laws are "a consumer welfare

prescription"); *SCFC ILC, Inc. v. Visa USA, Inc.*, 36 F.3d 958, 962 (10th Cir. 1994) (the

"objective[] of antitrust regulation" is "to improve people's lives . . . [through] economic

efficiency . . . more efficient production methods . . . [and] through increased innovation")

(citation omitted).  Accordingly, Judge Easterbrook has explained that a court should err on the

side of allowing conduct because the market will typically self-correct any anticompetitive

effects, while a judgment erroneously prohibiting procompetitive behavior will create significant

and long-term societal costs.  Frank H. Easterbrook, *The Limits of Antitrust*, 63 Tex. L. Rev. 1, 2-

7 (1984) (noting that "wisdom lags far behind the market" and firms must be allowed to

experiment with innovative practices).  The Ninth Circuit has likewise explained that if market

forces can potentially "cure the perceived problem," then "a court ought to exercise extreme

caution because judicial intervention in a competitive situation can itself upset the balance of

market forces, bringing about the very ills the antitrust laws were meant to prevent." *United

States v. Syufy Enterprises*, 903 F.2d 659, 663 (9th Cir. 1990).

## II.       The Saltzer Transaction Will Promote Competition

There is no dispute—in this case, in academic literature, or in federal policy—that

integration in health care benefits consumers by giving rise to higher-quality and higher-value

care.  In the words of plaintiffs' expert, Dr. Kizer, "[t]here is general consensus among

healthcare leaders, policymakers, academicians, and other healthcare stakeholders that there is an

urgent need to re-engineer the delivery of healthcare to coordinate patient care across conditions,

providers, settings, and time so that it is safe, timely, effective, efficient, and patient-focused."

Ex. C, Kizer Rept. ¶ 21.  As the Court will hear from several witnesses, integrated care is widely

recognized to be the best means to achieve the "triple aim": improving the health of the

population, improving the quality and accessibility of care, and reducing the per capita cost of

care.

**DEFENDANTS' PRETRIAL MEMORANDUM - 10**

There is likewise no dispute that one of the fundamental flaws in the existing health care system is its widespread reliance on FFS payment for care—*i.e.*, payment based on the number of office visits, procedures, and tests.  As Dr. Kizer has opined, FFS payment will need to be "largely phased out in coming years and replaced with value-based payment methods."  *Id.* ¶ 107.  Instead of being compensated for the *volume* of care they provide, providers will instead need to take on risk in their payment contracts, so that their compensation is based on the *value* of care they provide to their member population.  In order to accomplish this dramatic but necessary transformation, Dr. Kizer has opined that "healthcare providers of all types, regardless of their organizational structure, will have to learn to partner and collaborate to achieve clinical integration and to be better stewards of limited healthcare resources."  *Id.*  Indeed, the federal government itself has encouraged expanding the availability of shared-risk, integrated care by establishing accountable care organizations ("ACOs"), which are "groups of providers of services … [who] work together to manage and coordinate care for Medicare fee-for-service beneficiaries," and who must be "willing to become accountable for the quality, cost, and overall care of the Medicare fee-for-service beneficiaries assigned to it," and "to promote evidence-based medicine and patient engagement, report on quality and cost measures, and coordinate care," among other requirements.  42 U.S.C. § 1395jjj(a)(1)(A), (b)(2)(A), (b)(2)(G).

In this trial, St. Luke's will demonstrate that it has embarked on a long-term mission to achieve just these goals.  St. Luke's is seeking to provide integrated care in Idaho, with risk-based contracts so that providers are compensated based on value rather than volume of care.  As we will show, the Saltzer transaction is a critical step in this endeavor, and will significantly advance the achievement of St. Luke's goals, particularly in Canyon County.

As noted above, the plaintiffs do not dispute that integrated, risk-based care offers tremendous benefits to consumers as compared to the fragmented, FFS care that currently predominates.  Plaintiffs instead offer essentially two responses: (1) that St. Luke's will not, in fact, achieve benefits from integration, and (2) that all such benefits can be equally achieved without the Saltzer transaction.  At trial, St. Luke's will demonstrate that neither of these responses has merit.

### A.     St. Luke's Will Bring Integrated Care to the Population of Southern Idaho.

As Dr. Pate will explain, St. Luke's is in the process of transforming the delivery of health care by offering the population of southern Idaho clinically integrated, risk-based care. The hallmarks of that transformation include:

- a system that is staffed and equipped to provide a broad range of high-quality health services;

- a physician culture of teamwork and focus on value for patients, including value that is derived through appropriate utilization of evidence-based care, and management and leadership structures that ensure that physicians work together to improve care and lower cost;

- provider incentives aligned with the needs and wants of patients for high-quality, affordable care;

- a substantial investment in health information technology, including both an electronic health record, which allows for accurate recording of patient data and seamless communication among providers, as well as automated order sets and notices to providers regarding patient care, and data analytic tools that permit aggregation and actionable reporting of systemwide data;

- all or most revenue to providers from one common source, so that all components of the system have an interest in helping to lower the costs of the other components, and have no countervailing interest in "hoarding" patients or increasing utilization; and

- a population health focus that includes timely identification of patients whose conditions make them particularly at risk for need of costly care, and education and care management processes to reduce their risks.

**DEFENDANTS' PRETRIAL MEMORANDUM - 12**

Dr. Pate will explain that the financially and clinically integrated delivery system that St. Luke's is building is a product fundamentally different from the traditional, fragmented model of FFS medicine that is currently the norm in southern Idaho.  In a successful integrated care system, providers coordinate care using evidence-based best practices.  Through risk-based contracting and value-based compensation for providers, such a system avoids the perverse effects of the incentive for providers to incur greater fees by providing more services.  Professor Enthoven will likewise testify that it is well recognized in health care policy that tightly integrated delivery systems such as Geisinger Health System and the Mayo Clinic, the models on which St. Luke's plan is based, offer the greatest potential for raising quality while reducing cost.

In order to evolve into an integrated delivery system, St. Luke's has expanded both its physical and technical infrastructure and the base of providers who are employed by or engaged through a professional services agreement ("PSA").  It built, *inter alia*, the St. Luke's Magic Valley Medical Center and the St. Luke's Nampa Emergency Department.  And it acquired or affiliated with several previously independent physician practices—including a number of PCPs, who play a particularly important role in providing high-value integrated care.  Notably, St. Luke's does not affiliate with any medical group unless its physicians are committed to the same transformative goal that St. Luke's seeks to achieve.  These actions have helped to position St. Luke's to have the necessary scale—in terms of both providers and patient population—to provide truly integrated care.

1.      **Steps That St. Luke's Has Already Taken**

a.      **Investment in information health technology**

St. Luke's has invested substantial time and resources to adopt an EHR using the Epic platform, which is recognized as the "gold standard" among electronic health records.  St. Luke's overall financial investment in the system is anticipated to be near $200 million, with $50 million

**DEFENDANTS' PRETRIAL MEMORANDUM - 13**

already expended.  The Epic EHR is a foundational investment that dramatically furthers St. Luke's progress toward integrated care.  First, use of the Epic EHR allows St. Luke's to maintain accurate, accessible electronic records for all patients, which can be seamlessly shared among St. Luke's providers coordinating a particular patient's care.  Each provider can (and must) see and populate the patient's history, thus avoiding wasteful duplication and harmful errors.  The Epic EHR also offers tools for providers—including automated order sets and notices—so that providers are automatically informed of the standard of care for individual patients' circumstances, thus "hardwiring" the standardized, evidence-based best practices that St. Luke's physicians and leaders have worked to identify.

Moreover, with information drawn from the EHR, St. Luke's is able to aggregate, analyze, and act on systemwide data.  Using its WhiteCloud data analytics tool, St. Luke's providers are able to determine and standardize best provider practices to promote high-value care.  St. Luke's has created a "clinical integration scorecard" that allows it to assess objectively quality and other measures that can be tied to individual physicians and groups of physicians within the system.  The WhiteCloud tool also allows individual St. Luke's providers to see various statistics related to themselves and their patients.  For example, it shows providers how their patients, as a group and individually, are faring on various measures (such as the number of a PCP's patients who have their blood pressure maintained below 140/90), and allows providers to see how their own performance compares to that of their peers in the St. Luke's system—so that providers can work with each other to improve care.  Finally, the WhiteCloud tool analyzes and presents information on the cost of care provided by St. Luke's—and by other providers for those patients for whom St. Luke's bears risk—allowing St. Luke's to target high-cost patients for early intervention and to identify providers who may be over-utilizing expensive services.

**b.      Risk-based contracting.**

Consistent with Dr. Kizer's opinion and the federal policy establishing ACOs, Dr. Pate and Mr. Kee will explain why providers must move away from FFS payment, and toward contracts with payers whereby the providers take on financial risk for the patients' care. However, as Dr. Pate and Mr. Kee will explain, certain predicates greatly facilitate a health system's ability to take on risk successfully.  For one, the system must have high-quality data, which is necessary both to make appropriate financial decisions, and to identify which forms of care produce the highest value for patients.  Second, the system must have a sufficient patient or member base over which to spread the risk, so that highly expensive treatment required for a small number of patients will not overwhelm the system.  And third, the system must have a sufficient number of providers willing both to adhere to, and to contribute to the development of, the high-value forms of care that the system has identified and put in place.

St. Luke's is working to implement these predicates and to increase its risk-based contracting.  It is committed to being "risk ready"—*i.e.*, ready to have 100% of its contracts be risk-based—by 2015.  Commercial payers have been unwilling fully to partner with St. Luke's in making this needed transformation.  Accordingly, St. Luke's has worked with SelectHealth, a non-profit insurer, to bring an entirely new insurance product to Idaho.

St. Luke's and SelectHealth now offer an insurance product in which the health care provider network—anchored by St. Luke's—shares in the savings that result from lowering the cost of health care.  As will be explained by St. Luke's leaders and Patricia Richards, CEO of SelectHealth, this shared savings plan differs significantly from traditional commercial insurance, in which any premium that remains after payment of fees to providers goes back to the insurer, so that providers have no financial incentive to decrease patient costs by providing higher-value care.  The agreement between St. Luke's and SelectHealth, by contrast, provides

**DEFENDANTS' PRETRIAL MEMORANDUM - 15**

financial incentives to identify and reduce unnecessary utilization of services and to perform services in the most appropriate cost environment.  As William Deal, Director of the Idaho Department of Insurance, will explain, St. Luke's efforts to bring an entirely new insurance product into the Idaho market is a significant benefit to Idaho consumers.

St. Luke's has worked to take on risk through other measures as well.  It was the only Idaho-based health care provider selected by the federal government to participate as an ACO in the Medicare Shared Savings Program under the Affordable Care Act, and has been operating as ACO since January 1 of this year.  It has also entered into a fully risk-based arrangement with Blue Cross of Idaho, called TrueBlue, which is a Medicare Advantage contract (essentially, an HMO for Medicare beneficiaries).  And St. Luke's and its Select Medical Network are in final negotiations to enter into a total-cost-of-care contract with Regence, where St. Luke's has the opportunity to share modest upside gains and will transition to taking on downside risk.

### c.      Moving physicians to value-based compensation

With the data and analytical tools that St. Luke's now has, it is able objectively to evaluate the work of its providers.  This enhances St. Luke's ability to reach agreements with its providers to move away from FFS compensation toward value-based compensation based on metrics that providers agree fairly measure performance.  To date, St. Luke's has entered into contracts with two of its physician specialties (cardiology and pulmonology) to accept value-based compensation.  It will soon finalize a similar agreement with its internal medicine group, and intends to negotiate such arrangements with all other physicians as well.

### 2.      St. Luke's programs exemplifying the benefits of integrated care

At trial, St. Luke's will demonstrate that the improvements in health care that it is effectuating through clinical integration, including with previously independent physician

practices, are not just theoretical. Numerous individuals will testify that the tight affiliation that St. Luke's is seeking to achieve in the Saltzer transaction yields concrete benefits for patients.

For example, St. Luke's has initiated its CoPartner program, which uses a team-based care approach for chronic disease management of patients with multiple comorbidities. Using analysis of systemwide data, St. Luke's physicians will identify the approximately 5 percent of its member population that would benefit from upfront intervention and close monitoring, and provide such treatment in an effort to prevent the need for costlier care (such as hospitalization) down the line. St. Luke's DEaM program ("Diabetes Education and Management") similarly incorporates an electronic registry of diabetic patients and patients at risk for diabetes across St. Luke's population. These patients will be provided with low-cost, high-value education and monitoring through a team-based approach, involving nurses, nutritionists, and educators, in order to improve their health and avoid the need for higher-cost care later.

Additionally, St. Luke's Heart has, by taking a team-based approach impossible in independent, FFS practice, reduced readmissions by half and populated significantly more regional clinics for patients who live far from Boise. And the Center for Spine Wellness has, by standardizing processes and thereby reducing utilization of unnecessary procedures and tests, reduced costs per patient by about $1,000 for employees of Simplot, Inc. In terms of FFS revenues, this is a financial detriment to St. Luke's—but a substantial benefit to patients.

**B.    The PSA with Saltzer—as Contrasted with a Looser Affiliation—Will Further Promote Integrated Care.**

St. Luke's will also demonstrate that the transaction with Saltzer will permit the affiliated entities to achieve integrated care—particularly in Canyon County—faster and more effectively than could happen if the transaction had not happened or were unwound. The transaction will produce multiple benefits that would not exist otherwise.

**DEFENDANTS' PRETRIAL MEMORANDUM - 17**

**1.      Affiliating with Saltzer will promote St. Luke's efforts to bring integrated care to Canyon County.**

Plaintiffs contend that the Saltzer transaction is unnecessary because St. Luke's could work with Saltzer through a loose contractual affiliation rather than through the financial integration provided for in the PSA.  To be sure, St. Luke's can and does work effectively with independent physicians.  But St. Luke's leaders will explain why a tight integration with Saltzer through the PSA is material to St. Luke's ability to provide integrated care to the population it serves.  St. Luke's and Saltzer leaders will further explain how the affiliated entities promote integrated care far more effectively than an independent Saltzer could.

Initially, Saltzer is located in Canyon County, where St. Luke's had (before the Saltzer transaction) few employed or closely affiliated physicians.  It is essential to have a core or nucleus of employed or closely affiliated physicians in the region in order to achieve the benefits of coordinated, integrated care there.  As Professor Enthoven will explain, employed or closely affiliated physicians have the proper incentives to integrate care, and empirical evidence demonstrates that the benefits of integrated care occur more quickly and in greater measure through closer integration.  And the St. Luke's leaders will explain that, in their experience, physicians who are employed or under a PSA are more willing to be involved in the administrative and non-fee-generating aspects of clinical integration.

Additionally, the St. Luke's leaders will explain that the transaction is particularly supportive of their mission of providing integrated care because Saltzer is a group of predominantly PCPs who are committed to St. Luke's goals—*i.e.*, the triple aim. Of all physicians, PCPs play a unique role because they serve as the access point for patients, and it is through PCPs that patients can be identified for programs like CoPartner or DEaM.  The

**DEFENDANTS' PRETRIAL MEMORANDUM - 18**

transaction is thus important to ensure a close working relationship between Saltzer physicians and the St. Luke's physicians and administrators working to promote clinical integration.

Close alignment with a substantial core of its physicians, especially its PCPs, also enhances St. Luke's ability to engage in risk-based contracts like the SelectHealth product. Ms. Richards of SelectHealth will explain that the ability to compensate physicians based on their performance in providing high-value care and based on their non-fee-generating contributions makes a system more successful in taking on risk because they enable the system to contain costs while providing high-value care. Such compensation schemes are significantly easier to implement and more effective when physicians are employed or subject to a PSA rather than merely loosely affiliated. Similarly, Scott Clement of commercial insurer Regence stated that Regence has been willing to engage in a risk-based, "total cost of care" contract with St. Luke's due to St. Luke's substantial numbers of employed physicians.[3]

### 2.      Saltzer patients will benefit from the transaction.

Allowing the transaction to stand will also create significant benefits for Saltzer and its patients. Significantly, as a result of the transaction, the Saltzer physicians will have use of St. Luke's Epic system and WhiteCloud data analytics tool. As discussed above, those systems create substantial benefits for St. Luke's, all providers in its system, and the entire population that St. Luke's serves. Indeed, although Epic has not yet been rolled out to Saltzer (as a result of a commitment made to this Court at the preliminary injunction stage), data from the Saltzer physicians is already being incorporated into the WhiteCloud tool, for analysis and use by Saltzer physicians and for the broader system. Saltzer's Dr. John Kaiser will explain that access

---

[3] Ex. D, Deposition of Scott Clement at 63:10-25, 162:16-23.

**DEFENDANTS' PRETRIAL MEMORANDUM - 19**

to such technology—which is extremely expensive—was a major reason why Saltzer sought out the affiliation with St. Luke's.

Plaintiffs have asserted that access to St. Luke's information technology will not create benefits of integrated care because Saltzer already uses a different electronic medical record ("EMR"), eClinicalWorks.  However, Dr. Kaiser will explain that the functionality of eClinicalWorks is dramatically less than that of St. Luke's Epic system and WhiteCloud tool.  In particular, Saltzer's eClinicalWorks program does not perform several of the functions that experts agree provide the greatest benefits associated with EHRs. The affiliation thus creates a significant technological improvement for the Saltzer physicians and for patients.

Plaintiffs also contend that Saltzer could benefit from St. Luke's information technology even without the transaction if Saltzer paid to use that technology through St. Luke's anticipated (but not yet in place) affiliate program.  Through the affiliate program, St. Luke's intends to subsidize the high prices that independent physician groups must pay to use the Epic system. Even with the subsidy that St. Luke's intends to offer, however, use of Epic remains highly costly, and, as described in Part IV, *infra*, Saltzer's financial condition would be tenuous if the transaction were to be unwound.  Moreover, if Saltzer were to revert to its prior status as an independent group compensated on a FFS basis, it would have little incentive to pay for St. Luke's health technology, as one of the goals and effects of that technology is to reduce unnecessary (but, for FFS providers, profitable) utilization.

Additionally, St. Luke's affiliation with Saltzer will increase access to medical care for Medicaid patients in Idaho.  St. Luke's is committed to providing quality care to all patients, regardless of their financial status or insurer.  As Idaho Department of Health & Welfare Director Richard Armstrong will explain, maintaining health care access for Medicaid patients is

**DEFENDANTS' PRETRIAL MEMORANDUM - 20**

a significant concern for the Department, particularly in light of the expected increase in Medicaid enrollment.

Significantly, as Professor Enthoven will explain, this is not an issue of Saltzer providing "low-quality" care in the past. Instead, the affiliation will enable Saltzer to move away from providing FFS care as a stand-alone group, with the inherent limitations and misaligned incentives that (as plaintiffs' expert Dr. Kizer agrees) go along with providing care according to that framework. Professor Enthoven will explain the substantial evidence that integration—and particularly, the type of close financial integration reflected in the Saltzer/St. Luke's relationship—is more effective at promoting integrated care. While it is true that looser affiliations among independent organization can produce some benefits of coordination, tighter integration has been shown to be more effective. Professor Enthoven will thus opine that the Saltzer transaction can be expected to produce the benefits of integrated care more effectively and more quickly than could occur through any looser relationship.

III.     **Plaintiffs' Evidence of Purported Anticompetitive Effects Is Unpersuasive**

     A.     **Plaintiffs' Claims of Supposed Harms from Concentration Are Overblown.**

Both sets of plaintiffs place heavy reliance on the HHI analysis, contending that the Saltzer transaction creates a presumptively unlawful increase in concentration in the market for PCP services in Nampa. This increase in concentration, they assert, will give St. Luke's "market power," which supposedly will lead to anticompetitive effects. Putting aside the limited value of HHI analysis in litigation, *see* p. 6, *supra*, plaintiffs' claims are flawed because they are based on an artificially narrow geographic market. Moreover, the specific facts of this case demonstrate that competition for the delivery of health care in southern Idaho remains vigorous. For these reasons, plaintiffs' wooden reliance on HHI analysis is misplaced.

**DEFENDANTS' PRETRIAL MEMORANDUM - 21**

### 1.    Plaintiffs Have Failed to Define a Proper Geographic Market.

As noted above, plaintiffs bear the burden of proving that they have properly defined the relevant geographic market.  *R.C. Dick Geothermal Corp. v. Thermogenics, Inc.,* 890 F.2d 139, 143 (9th Cir. 1989).  A proper geographic market is "an area of effective competition … where buyers can turn for alternate sources of supply." *Morgan, Strand v. Radiology Ltd*. 924 F.2d 1484, 1490 (9th Cir. 1991).  Plaintiffs' experts contend that the market for adult PCP services is limited to Nampa.  But as defendants' expert, David A. Argue, Ph.D., will testify, that proposed definition excludes numerous providers who act as competitive constraints on providers in Nampa.  Plaintiffs therefore inappropriately limit the scope of the relevant market.

Dr. Argue has looked at patient origin data for Nampa physicians—*i.e.*, data showing the distances patients currently travel to seek treatment by PCPs located in Nampa, a region called the providers' "service area."  He has looked specifically at service area zip codes that account for the top 90% of patients of the Nampa physicians, and determined that Nampa physicians account for *only one-third* of the PCP services provided to the patients in that 90% service area. The remaining two-thirds are provided by physicians located outside of Nampa.  At the same time, his analysis demonstrates that *nearly one-third* of patients actually being treated by Nampa physicians come from outside of Nampa.  That is, one-third of patients obtaining treatment in Nampa have chosen (under competitive conditions) to travel into Nampa for care.

As these data demonstrate, a substantial volume of consumers already are, at currently competitive prices, willing to travel into and out of Nampa in order to obtain care.  If prices were to increase to supracompetitive levels, health plans and employers could and would motivate patients to leave Nampa or to avoid traveling into Nampa for primary care.  Dr. Argue will thus opine that PCPs in Nampa are competitively constrained by physicians located outside of Nampa including at least those in Caldwell, Meridian, and other areas of western Ada County.  Further,

**DEFENDANTS' PRETRIAL MEMORANDUM - 22**

Dr. Argue will testify that, if St. Luke's were to raise prices above competitive levels, both St. Luke's and Saltzer would lose so many patients that it would be unprofitable to do so.  Indeed, the fact that Saltzer did not raise its prices above competitive levels when it had (according to plaintiffs) more than 90% of the Nampa market strongly supports Dr. Argue's conclusion.

Although the two sides' experts dispute the best method for defining the market, the Court need not rely on theory alone.  Instead, the Court can look to the experience of Micron Technology, which has some 2,000 employees in Nampa.  In 2008, Micron established a tiered health plan network insurance product that allows employees to choose among narrow networks of physicians.  The first, least expensive tier of providers that employees can use includes providers located at Micron's facility in Boise.  The next tier comprises physicians in the Micron Health Partners Network ("MHPN"), which includes Saint Alphonsus providers but excludes Saltzer and St. Luke's providers.  The third, and most expensive, network tier includes physicians in the "Wise Network."  Both Saltzer and St. Luke's were excluded from the Wise Network until January 2011, when Saltzer (but not St. Luke's) became part of Wise.

Thus, from July 2008 through January 2011, Micron's health plan successfully excluded *both St. Luke's and Saltzer* from its covered networks.  Since 2011, it has continued to exclude all St. Luke's providers.[4]  Importantly, Micron's employees responded to the differentials in copayments by using alternative providers.  Even today, each time a Micron employee goes to a PCP, he or she must choose among the providers in the tiers, and the employees overwhelmingly choose the limited options in MHPN rather than the broader options in the Wise Network (including Saltzer) for a savings of as little as $15 per visit.  In other words, Micron's employees

---

[4] Other employers, including WalMart, which employs some 1,500 in Ada and Canyon counties, have followed suit, signing onto Micron's "high performance" network that excludes both St. Luke's and Saltzer physicians.

**DEFENDANTS' PRETRIAL MEMORANDUM - 23**

have demonstrated, contrary to plaintiffs' experts' theorizing, that patients are willing to limit their physician options in response to small differences in their copayment.

The sensitivity to small price differentials demonstrated by Micron employees makes it implausible to believe that other patients would not choose non-St. Luke's physicians to avoid higher copayments.  Many of those patients would not even have to travel farther to do so—they could use local, non-Nampa physicians rather than driving into Nampa.  As the Micron experience shows, health plans and employers can motivate patients to choose lower-cost physicians.  Thus, an attempted above-competitive price increase by St. Luke's in Nampa could be defeated, and Nampa cannot be a properly defined market.

### 2. Notwithstanding the Saltzer Transaction, There Is Vigorous Competition in Any Properly Defined Relevant Market.

Plaintiffs also fail to account for many circumstances specific to this region and industry that will prevent any supracompetitive pricing.  For one, health care in southern Idaho is marked by intense competition by two major players—Saint Alphonsus and St. Luke's.  Such circumstances necessarily produce high HHI figures, but do not indicate a lack of competition.

Additionally, the industry features confidential bilateral bargaining between health care providers and sophisticated commercial insurers.  Markets characterized by such bilateral bargaining do not require competition from a large number of suppliers to yield competitive outcomes.  Moreover, health insurers and employers have demonstrated that through use of products such as tiered networks, they can effectively encourage enrollees to use the least costly providers.  *See, e.g.*, *Baker Hughes*, 908 F.2d at 986 (concentration held not indicative of anticompetitive effects where market involved complex products sold to sophisticated consumers, not "trinkets sold to small consumers who may possess imperfect information and

limited bargaining power"); *Syufy*, 903 F.2d at 670 (affirming judgment for antitrust defendant who "[w]hile successful, [was] in no position to put the squeeze on distributors").

Plaintiffs also give inadequate consideration to the likelihood of entry by new physicians or expansion of capacity by existing physicians if St. Luke's engages in supracompetitive pricing.  Both Canyon and Ada Counties are growing, with Canyon County alone seeing a 44% increase in population between 2000 and 2010.  Both St. Luke's and Saint Alphonsus have been investing in expanding their operations in response to this growth.  While plaintiffs' experts contend that recruitment of new physicians into the market is slow and uncertain, Dr. Argue will show that if a combined Saltzer/St. Luke's were in fact to impose supracompetitive pricing, recruitment and expansion by Saint Alphonsus and other competitors to defeat such pricing would soon follow, causing any such increase to be, at most, short-lived.

Finally, the make-up of St. Luke's and its Board further confirms the unlikelihood that it will seek to impose supracompetitive prices.  St. Luke's is a charitable institution committed to enhancing the welfare of the population of southern Idaho.  As the Court will hear from Arthur Oppenheimer, a member of St. Luke's Board of Directors, that Board includes representatives of employers who have a material interest in keeping their employees' health care costs low.  *See, e.g.*, *FTC v. Butterworth Health Corp.*, 946 F. Supp. 1285, 1297 (W.D. Mich. 1996) (finding that "the involvement of prominent community and business leaders on the boards of these [nonprofit] hospitals can be expected to bring real accountability to price structuring").

### B. Plaintiffs' Evidence of Supposed Price Increases Is Unconvincing.

Plaintiffs also point to St. Luke's prior transactions with other independent physician groups (primarily in the Magic Valley), as well as past negotiations between commercial insurers and St. Luke's and Saltzer, in an effort to support their claim of supposedly likely price increases.  Neither is compelling.

**DEFENDANTS' PRETRIAL MEMORANDUM - 25**

1.       **St. Luke's Past Transactions, in Other Markets, Do Not Support Plaintiffs' Claims That the Saltzer Transaction Will Result in Anticompetitive Effects in Nampa.**

Plaintiffs contend that prices have increased after St. Luke's acquired the Magic Valley Medical Center, or acquired or affiliated with other independent physician groups, and that this is supposed evidence that the Saltzer transaction will result in anticompetitive pricing.  For multiple reasons, however, the evidence does not support plaintiffs' claims.

Initially, plaintiffs' experts have not undertaken any analysis of competitive conditions in the Magic Valley or the competitiveness of St. Luke's pricing more generally.  This has two major consequences.  First, it means that plaintiffs do not (and could not) show that the Magic Valley is sufficiently analogous to their alleged Nampa market to support an inference that supposed anticompetitive effects in the Magic Valley will occur in Nampa.  *See* Ex. B, Aug. 26, 2013 Tr. at 38.  Indeed, Dr. Argue will testify that the Magic Valley is *not* analogous to Nampa.  Second, plaintiffs cannot demonstrate that any price increases in the Magic Valley (or elsewhere) are the result of St. Luke's exercising market power in order to engage in supracompetitive pricing.  Contrary to plaintiffs' unsupported theories, St. Luke's will show that any price increases in the Magic and Treasure Valleys are attributable to other, legitimate factors.

One significant factor is increases in reimbursement from Medicare due to provider-basing.  As St. Luke's explained in its motion in limine regarding provider-basing, Dkt. 159, Medicare regulations provide that when a previously independent medical facility is converted into a hospital facility—and when the facility satisfies a host of regulatory criteria, including providers' willing acceptance of Medicare and Medicaid patients—it is eligible to receive higher Medicare reimbursement.  Thus, any price increases from Medicare following St. Luke's provider-basing of previously independent clinics is a result of federal regulations—not market power.  To be sure, in the commercial market, whether St. Luke's can obtain provider-based

reimbursement is a subject of negotiation with payers.  Notably, however, the two largest

commercial payers—Blue Cross and Regence—do *not* allow provider-based reimbursement.

Plaintiffs also say that if St. Luke's converts a previously independent practice to an

outpatient hospital department, St. Luke's may begin billing for services at that location under

St. Luke's contract rather than the previously independent practice's.  Plaintiffs contend that this

results in commercial payers paying rates for ancillary, non-physician services (such as X-rays)

higher than what they paid when the acquired sites were independent.  *See, e.g.*, Dkt. 180 at 5-6.

However, *there is no "ancillary services" market at issue in this case*.  Plaintiffs have identified

no evidence to suggest that St. Luke's will have market power in any supposed market for

"ancillary services."  Moreover, whether St. Luke's can bill under its contract for ancillary

services at previously independent locations is a subject of negotiation with payers.

Finally, as St. Luke's leaders and physicians will explain, St. Luke's has invested

tremendous resources to construct new facilities in Magic Valley, and has dramatically improved

the accessibility and quality of care there.  Any increase in price in Magic Valley necessarily

reflects these improvements.

### 2. Plaintiffs' Evidence of Price Negotiations with Commercial Insurers Does Not Support Any Claim of Anticompetitive Pricing

Plaintiffs also intend to present testimony from Jeffrey Crouch, a representative of Blue

Cross of Idaho ("BCI"), relating anecdotes of past negotiations between St. Luke's and BCI in

which BCI obtained less favorable terms than it wished.  However, Mr. Crouch's subjective

impression of those negotiations does not establish harm to competition in any relevant market.

And plaintiffs' experts have not analyzed St. Luke's pricing in a manner that could offer

objective support to the notion that St. Luke's has exercised market power in its negotiations

with BCI.  Indeed, the evidence is to the contrary.

**DEFENDANTS' PRETRIAL MEMORANDUM - 27**

As Dr. Argue will show, St. Luke's acquisitions have not caused *any* increase in payments St. Luke's has received for physician services from commercial insurers—*i.e.*, in the only product market the government plaintiffs have alleged in this case.  Indeed, Mr. Crouch has acknowledged that none of St. Luke's physician acquisitions resulted in any increase in physician fees paid by BCI to St. Luke's, and some have resulted in decreased physician fees.

Similarly, plaintiffs' evidence of contract negotiations with commercial insurers fails to support their claims that Saltzer has market power in the alleged market for physician services in Nampa.  Saltzer has always accepted BCI's statewide rate for physician services—despite Mr. Crouch's characterization of Saltzer as a "must have" provider.  Saltzer did obtain higher physician rates from Regence, another commercial insurer, as a result of its agreement to participate in Regence's development of a regional PPO network.  As Dr. Argue will show, the circumstances of the contract do not support any claim of market power on the part of Saltzer.  In any event, as a result of the transaction with St. Luke's, Saltzer physicians are now reimbursed at St. Luke's previous rate—*i.e.*, Regence's statewide rate—so that the challenged transaction has actually *reduced* the rates that Saltzer receives.

Plaintiffs also claim that the Saltzer transaction will permit St. Luke's and Saltzer to exercise market power to raise prices for other services—such as ancillary services.  But, as noted above, *no "ancillary services" market is at issue in this case*.  Basic economics dictates that unless it has market power in a relevant market for "ancillary services"—which plaintiffs have not attempted to establish—St. Luke's cannot successfully charge supracompetitive prices in that market.  Supposed power in one market does not, without substantially more, translate to an ability to engage in supracompetitive pricing in another market.

**DEFENDANTS' PRETRIAL MEMORANDUM - 28**

**C.     The Hospital Plaintiffs' Claims of Unlawful Exclusionary Conduct Are Factually and Analytically Unsupported.**

The hospital plaintiffs (but not the government plaintiffs) contend that the transaction will harm competition in three additional alleged hospital services markets.  In particular, they assert that by "controlling" a substantial number of PCPs in Nampa, St. Luke's will have the ability to deprive them of referrals from those PCPs, thus harming both the hospital plaintiffs and, they contend, competition.  This position is flawed both legally and factually.

As a legal matter, loss of referrals does not equate to harm to competition (as opposed to harm to a competitor) unless the loss is so great that it forecloses competition.  *See generally* Areeda ¶ 1010; Part I.B.2(b), *supra*.  Notably, the hospital plaintiffs' expert, Dr. Haas-Wilson, has failed even to attempt to assess whether the quantity of referrals purportedly lost will cripple the effectiveness of Saint Alphonsus or TVH to compete in any market, or whether any purported effects on Saint Alphonsus or TVH will lead to harm *to competition*.

As a factual matter, plaintiffs' claims of loss of referrals are unsupported.  To begin, the foreclosure-related opinions of Dr. Haas-Wilson are based on her analysis of a half-dozen previous acquisitions of specialty physician groups by St. Luke's, including orthopedic surgeons, cardiovascular surgeons, and pulmonologists, who perform many of their services in a hospital. She claims that following their affiliation with St. Luke's, the percentage of inpatient and outpatient encounters at Saint Alphonsus and TVH attributable to these physicians decreased substantially.  She relies on that evidence to infer that admissions from Saltzer physicians will likewise decrease substantially.  This analysis fails for several reasons.

First, although Dr. Haas-Wilson points to a reduction in referrals from individual St. Luke's-affiliated practices, she has neither shown nor even assessed whether Saint Alphonsus suffered a *net* loss in referrals or admissions as a result of the transactions.  This is significant,

because the evidence will show that when previously independent specialty physician groups became affiliated with St. Luke's, Saint Alphonsus PCPs reduced their referrals to those St. Luke's-affiliated specialists—and in at least some cases instead directed their referrals to non-St. Luke's specialists who continued to admit their patients at Saint Alphonsus.  Thus, any loss of referrals is attributable to the conduct of Saint Alphonsus physicians.

To take one example, Professor Haas-Wilson contends that Cardiothoracic and Vascular Associates (CVA) stopped admitting or admitted fewer patients to Saint Alphonsus after CVA affiliated with St. Luke's.  However, the evidence shows that referrals from Saint Alphonsus PCPs to CVA surgeons went from 113 in the one-year period prior to their affiliation with St. Luke's to 37 in the one year-period after they affiliated with St. Luke's.  As Professor Haas-Wilson conceded in her deposition, she has made no effort to determine whether Saint Alphonsus actually "lost" admissions as a result of CVA's affiliation with St. Luke's—or whether the change simply reflects that Saint Al's PCPs started sending their referrals to *other* cardiothoracic surgeons who continued to admit those patients to Saint Alphonsus.  In fact, this latter explanation is the correct one.  Indeed, Saint Alphonsus confirmed that it had not experienced any actual loss from CVA in a letter to the Federal Trade Commission in July 2012.[5]

Second, the methodology used by plaintiffs obscures the fact that several referrals which Dr. Haas-Wilson regards as coming from Saint Alphonsus physicians came in fact from physicians associated with St. Luke's.  Specifically, the evidence will show that what frequently occurred is that a St. Luke's affiliated physician referred a patient to a Saint Alphonsus hospitalist.  That hospitalist thus appears as the admitting physician—when in fact the referral came from a St. Luke's physician.  This methodological shortcoming taints the entire analysis.

---

[5] Ex. E (TX 2231).

**DEFENDANTS' PRETRIAL MEMORANDUM - 30**

Finally, St. Luke's will demonstrate that it has not previously ordered and will not now order, or even incentivize, its affiliated physicians not to refer or admit patients to the hospital plaintiffs.  In fact, as the Court will hear from Drs. Kaiser, Patterson, and Kunz, St. Luke's has assured the Saltzer physicians that they are free to make decisions on patient referrals based on the best interests of their patients and that they should continue to send patients to Saint Alphonsus–Nampa.  These physicians will attest that this is precisely what the Saltzer physicians have done and what they intend to continue doing.  Physicians from other practices acquired by St. Luke's will similarly testify.  To the extent referrals to the hospital plaintiffs from St. Luke's affiliated physicians have decreased, the explanation does not lie in any St. Luke's mandate.

## IV.      Divestiture Is Not an Appropriate Remedy

The Court should hold that the Saltzer transaction does not violate the antitrust laws. Should the Court find a violation, however, it will have broad discretion to fashion a remedy that is "effective to redress the antitrust violation proved."  *United States v. E.I. du Pont de Nemours & Co.*, 366 U.S. 316, 323 (1961).  Here, divestiture would be inappropriate for three reasons.[6]

### A.      Divestiture Would Not Inject Competition into the Market

To begin, far from injecting competition into the market, divestiture of Saltzer is most likely to lead to dissolution of that entity.  As Saltzer's Chief Executive Officer, William Savage, will testify, Saltzer will face significant financial difficulties if the Court orders it divested from

---

[6] While divestiture is a common remedy, it "is not necessarily the most appropriate means for restoring competition." *FTC v. PepsiCo, Inc.*, 477 F.2d 24, 29 n. 8 (2d Cir. 1973).  Indeed, "divestiture … should not be entered into lightly or without substantial evidence that the benefit outweighs the harm.  Its far-reaching effects put it at the least accessible end of a spectrum of injunctive relief."  *Garabet v. Autonomous Techs. Corp.*, 116 F. Supp. 2d 1159, 1172 (C.D. Cal. 2000).  Moreover, "just as [a] merger must be viewed in the context of the particular market involved, its structure, history, and probable future, these considerations must also be taken into account in determining the appropriate relief."  *United States v. Reed Roller Bit Co.*, 274 F. Supp. 573, 585 (W.D. Okla. 1967) (quotation marks and citation omitted).

**DEFENDANTS' PRETRIAL MEMORANDUM - 31**

St. Luke's.  As an independent group, prior to its affiliation with St. Luke's, the Saltzer physicians paid for a significant portion of Saltzer's operating expenses—including the costs associated with its facilities and administrative staff—based on the proportion of each physician's revenues to Saltzer's total revenues.  Compared to fiscal year 2012, Saltzer has lost a total of thirteen physicians—including Saltzer's seven highest-earning physicians, who left in late November 2012 to join Saint Alphonsus—while only starting a single new physician.  Because the seven physicians who departed were the highest-earning Saltzer physicians, they also covered a disproportionate share of Saltzer's overhead expenses.

St. Luke's expert Lisa Ahern will further offer her opinion that if Saltzer were required to return to operations as an independent physician group, the Saltzer physicians would experience a decrease in compensation of 34% on average as compared to fiscal year 2012.  Mr. Savage will testify that the loss of income that Saltzer physicians would suffer as a consequence of divestiture would make it difficult for Saltzer to retain its existing physicians or to recruit physicians to replace those who have departed Saltzer.  Ms. Ahern's expert opinion similarly is that a compensation reduction of that magnitude will negatively affect retention and recruitment of physicians.  Indeed, we will show that the most likely outcome of divestiture would be the break-up of Saltzer and possibly the departure of some physicians from Nampa.

### B.    Divestiture Would Cause Substantial Harm To Consumers

St. Luke's will also offer evidence to demonstrate that divestiture would be highly detrimental.  At a minimum, divesting Saltzer from St. Luke's would prevent St. Luke's and Saltzer from extending the benefits of integrated care to patients in Canyon County.  Saltzer would no longer have access to the technological infrastructure that St. Luke's can offer, and it would be unable independently to engage in either risk-based contracting or population health management.  Divestiture would thus risk thwarting the goal of the Department of Health and

**DEFENDANTS' PRETRIAL MEMORANDUM - 32**

Welfare to transition from FFS to value-based delivery of care.  It would pose a substantial risk of undermining the goal of the Department to provide quality care to the increasing number of Idahoans who are covered by Medicaid or are uninsured.  And it would risk undoing the goal of the Department of Insurance to bring new forms of competition into the insurance market.

Subjecting the people of Ada and Canyon counties to these harms is not necessary in order to "effective[ly] … redress" any supposed anticompetitive effects.  *E.I. du Pont*, 366 U.S. at 323.  Instead, the Court could avoid any concern that the combined market share of St. Luke's and Saltzer will lead to higher prices through the exercise of market power in negotiations with payers by use of a conduct remedy—namely, requiring Saltzer to negotiate FFS contracts with payers independently from St. Luke's.  In these circumstances, Saltzer would be solely responsible for negotiating such contracts with payers, and would be free to enter into agreements with payers that do not contract with St. Luke's.  By limiting any such remedy to FFS contracts—not risk-based contracts—the Court can ensure that St. Luke's will retain the panel of physicians necessary to accept risk under such a contract.

A conduct remedy that requires separate negotiation of FFS contracts will address any concern that the transaction will allow St. Luke's to engage in supracompetitive pricing.  Payers and employers who, for whatever reason, do not wish to engage in risk-based contracting with St. Luke's and Saltzer will be presented with the same contracting choices that they had prior to the transaction, and no payer or employer would be forced to pay more than competitive prices as a result of their transaction.  No payer would have to agree to St. Luke's contract terms to gain access to the Saltzer physicians.  Nor would any customer have to agree to Saltzer's contract terms in order to gain access to St. Luke's inpatient, outpatient, or physician services.

**DEFENDANTS' PRETRIAL MEMORANDUM - 33**

Moreover, as compared to divestiture, a conduct remedy will offer consumers more choices and better care at lower cost. By ensuring that Saltzer will participate in its risk-based contracts, St. Luke's will be able to offer payers and employers alternatives to FFS contracting. St. Luke's will also be able to move forward and expand its risk-based agreement with SelectHealth. Notably, the FTC has itself shown approval for a conduct remedy like this one. *See In re Evanston Northwestern Healthcare Corp.*, 2008 WL 1991995, at *3-4 (FTC Apr. 28 2008) (ordering combined hospitals to separately negotiate with payers).[7]

### C.     Given the Unique Structure of The Transaction, Divestiture Would Be Particularly Inappropriate at This Time

In those cases in which divestiture is ordered, divestiture is necessary at the time of the litigation because if the transaction is allowed to go forward, it can never be unscrambled. This case presents a notable contrast. As defendants will show at trial, Saltzer remains a separate corporation. Moreover, the transaction documents set forth a detailed approach for separating Saltzer from St. Luke's should the transaction, contrary to the strong belief of the parties thereto, not engender the anticipated procompetitive benefits.

In these circumstances, there is simply no reason to order divestiture now—unless the Court concludes that there is absolutely no reasonable likelihood of procompetitive benefits if the transaction is allowed to go forward. Section 2 of the Sherman Act (prohibiting monopolization) and its analogue under the Idaho antitrust statute provide more than ample bases for ordering divestiture later if it turns out that St. Luke's raises prices above competitive levels or suppresses competition by excluding Saint Alphonsus or TVH from a sufficient number of referrals or networks to cripple the ability of these institutions to compete. And, as just noted,

---

[7] Notably, just three months ago, the FTC accepted a conduct remedy in another health care antitrust case. See *FTC v. Phoebe Putney Health Sys., Inc.*, No. 1-11-CV-00058 (M.D. Ga.) (Dkt. 129, June 15, 2013).

**DEFENDANTS' PRETRIAL MEMORANDUM - 34**

divestiture will be equally practicable as a technical matter down the road as it is now.  Indeed, holding off to see if the supposed consequences actually materialize has an additional benefit:  If Saltzer is permitted to continue its affiliation with St. Luke's, it might be able to regain the strength needed to be an effective competitor in the event of subsequent divestiture.

* * * * *

At the end of the day, this case raises the question of whether a mid-sized market such as Ada and Canyon Counties can realize the benefits of the clinically integrated care that Congress in the Affordable Care Act sought to incentivize and that the best thinkers in health policy believe to be our society's greatest hope for reducing cost while increasing quality.  For the inescapable fact is that creation of a physician-hospital network on a scale necessary to permit transformation from volume-based to value-based billing requires an integrated delivery system to align closely with a significant number of PCPs in the market.  On the facts of this case, if the Court were to find the Saltzer transaction unlawful, it would be sending a signal across America that wooden application of HHI numbers and the recitation of speculative competitive harms will relegate people in such markets to what the Seventh Circuit has termed "horse-and-buggy" medicine.  *Marshfield Clinic*, 65 F.3d at 1412.

This would be the absolutely wrong signal to send.  Foreclosing innovation in health care in this way is not consistent with—much less required by —the antitrust laws.  This Court should not allow this case—pressed by "industry players for whom such innovation poses a competitive threat" and regulators flexing "their muscles" to "demonstrate their value to the public"[8]—to become yet another barrier to innovation in health care.  Judgment should be entered for defendants.  At a minimum, divestiture of Saltzer should not be ordered.

---

[8] *See* Herzlinger, Ex. A.

**DEFENDANTS' PRETRIAL MEMORANDUM - 35**

DATED:  September 10, 2013.

STOEL RIVES LLP


/s/ J. Walter Sinclair
J. Walter Sinclair
Sara M. Berry

Jack R. Bierig *(admitted pro hac vice)*
Scott D. Stein *(admitted pro hac vice)*
Tacy F. Flint *(admitted pro hac vice)*
Ben Keith *(admitted pro hac vice)*

Attorneys for St. Luke's Health System, Ltd.
and St. Luke's Regional Medical Center, Ltd.


Brian K. Julian

Attorney for Saltzer Medical Group, P.A.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on September 10, 2013, I filed the above-named document electronically through the CM/ECF system, which caused the following parties or counsel to be served by electronic means, as more fully reflected in the Notice of Electronic Filing:

| | |
|---|---|
| Bely - FTC | bely@ftc.gov |
| Brett T. Delange - Atty General | brett.delange@ag.idaho.gov |
| Brian K. Julian - Saltzer | bjulian@ajhlaw.com |
| Brock Swartlze - St Al's | bswartzle@honigman.com |
| Bryan Nickels - St Al's | ban@dukescanlan.com |
| Carl Withroe - Atty General | Carl.Withroe@ag.idaho.gov |
| Chris Boisvert - TVH | crb@powerstolman.com |
| Colleen Funk - Atty General | colleen.funk@ag.idaho.gov |
| David Ettinger - St Al's | dettinger@honigman.com |
| Douglas E. Litvack - FTC | dlitvack@ftc.gov |
| Eric J. Wilson - SD Atty General | ewilson@gklaw.com |
| Henry C. Su | hsu@ftc.gov |
| J. Thomas Greene - FTC | tgreen2@ftc.gov |
| Jennifer Schwartz - TVH | jls@powerstolman.com |
| JSM - TVH | jsm@powerstolman.com |
| Kadye Bird - St. Al's | klb@dukescanlan.com |
| Kay Lynn Moorhouse | klm@dukescanlan.com |
| Keely Duke - St Al's | ked@dukescanlan.com |
| Kevin J. O'Connor - SD Atty General | koconnor@gklaw.com |
| Kevin Scanlan - St Al's | kjs@dukescanlan.com |
| Lara Phillip - St Al's | lara.phillip@honigman.com |
| N. Roberts - St Al's | nroberts@honigman.com |
| Paul Fabien - St Al's | pfabien@honigman.com |
| Peter C. Herrick - FTC | pherrick@ftc.gov |
| Portia L. Rauer - TVH | plr@powerstolman.com |
| Raymond Powers - TVH | rdp@powerstolman.com |
| S. Hakim - St. Al's | shakim@honigman.com |
| S.Sajewski - FTC | ssajewski@ftc.gov |
| Sandee Stogsdill - St Al's | sls@dukescanlan.com |
| Teresa Taylor - Atty General | teresa.taylor@ag.idaho.gov |
| Wendy K. Arends - SD Atty General | warends@gklaw.com |
| Syrena C. Hargrove – FTC | syrena.hargrove@usdoj.gov |
| Colleen D. Zahn | colleen.zahn@ag.idaho.gov |

By: /s/ J. Walter Sinclair
J. Walter Sinclair

**DEFENDANTS' PRETRIAL MEMORANDUM - 37**